

NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>ANGELA E. SANDERS,<br>　　　　　　　Debtor. | BAP No. NC-24-1025-CBG<br><br>Bk. No. 16-40374 |
| ANGELA E. SANDERS,<br>　　　　　　Appellant,<br>v.<br>FAY SERVICING, LLC; US BANK<br>TRUST, NA, not in its individual<br>capacity but solely as owner trustee for<br>VRMTG Asset Trust,<br>　　　　　　　Appellees. | **MEMORANDUM**<sup>*</sup> |

Appeal from the United States Bankruptcy Court
for the Northern District of California
Charles D. Novack, Bankruptcy Judge, Presiding

Before: CORBIT, BRAND, and GAN, Bankruptcy Judges.

---

＊ This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

## INTRODUCTION

Chapter 13[1] debtor Angela E. Sanders ("Sanders") appeals the bankruptcy court's order granting appellees' motion for summary judgment determining that Sanders was not post-petition current on her mortgage when she completed her chapter 13 plan payments pursuant to Rule 3002.1. Sanders also appeals the bankruptcy court's denial of her motion to reconsider the summary judgment order. Because the bankruptcy court did not err in granting summary judgment or abuse its discretion in denying the motion to reconsider, we AFFIRM.

## FACTS[2]

On March 27, 1995, Sanders and her husband executed a fixed rate note in the amount of $172,000.00 secured by a deed of trust (together, the "Loan") encumbering certain real property on Napa Avenue in Rodeo, California.

Since its origination, the holder and servicer of the Loan have changed many times.[3] US Bank is the current holder of the Loan and Fay

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] We exercise our discretion to take judicial notice of the docket and documents filed in Sanders's underlying bankruptcy case. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

[3] From Prudential Home Mortgage Co., the original lender, the Loan was transferred to Norwest Mortgage on July 20, 1996, then transferred to Wells Fargo Bank

Servicing, LLC currently services the Loan on behalf of US Bank.

## A.    Sanders's chapter 13 bankruptcy.

Sanders filed a chapter 13 bankruptcy petition on February 11, 2016. Sanders's fifth amended plan was confirmed on July 8, 2016. It was a cure-and-maintain plan, meaning that the payments to cure Sanders's $39,092.21 prepetition mortgage arrears would be paid through the chapter 13 trustee ("Plan Payments") and Sanders's ongoing post-confirmation monthly payments to maintain the mortgage would be made directly to the Creditor ("Maintenance Payments").

During the course of her bankruptcy, Sanders was rarely in compliance. Indeed, the chapter 13 trustee filed sixteen motions to dismiss based on Sanders's failure to timely make Plan Payments. Although each of the trustee's motions was eventually withdrawn, they demonstrated Sanders's persistent untimeliness. Sanders was even less consistent with her Maintenance Payments.

The record demonstrates that Sanders's failure to make her Maintenance Payments began shortly after filing her bankruptcy petition and well before the onset of COVID-19. As of June 5, 2020, the Creditor

---

N.A. ("Wells Fargo") on December 5, 2008, then transferred to Specialized Loan Servicing ("SLS") on February 12, 2019, and finally transferred to US Bank Trust, NA, not in its individual capacity but solely as owner trustee for VRMTG Asset Trust ("US Bank") on April 2, 2021. Because the Loan was transferred multiple times during Sanders's bankruptcy case, we refer to the holder and servicer of the Loan at the applicable time as "the Creditor."

presented evidence that Sanders was past due in post-petition mortgage payments in the amount of $38,324.28. According to the Creditor's accounting, which was consistent with the evidence Sanders presented, Sanders made 11 of her 12 monthly mortgage payments in 2016 and 2017. Sanders made seven monthly payments in 2018, four in 2019, one payment in 2020, and no Maintenance Payments thereafter.

## B.     The pandemic and Sanders's modified plan.

On March 5, 2021, the bankruptcy court confirmed Sanders's modified plan which extended the plan's term to 84 months[4] and acknowledged a 12-month temporary COVID-19 forbearance of Sanders's Maintenance Payments. The modified plan provided in ¶ 5.03, titled "Additional Sections and Corrections under Secured Claims," a reference to new ¶ 2.04(c) which added the following provision:

> The Debtor has requested and received a 12-month COVID-19 Mortgage Forbearance, under the Coronavirus Aid, Relief, and Economic Security Act, (or the "Cares Act") which started on July 10, 2020, and shall conclude, 12 months following, July 10, 2020; therefore, the Debtor is not required to make post-petition monthly, mortgage/home loan payments at this time. Post-

---

[4] Under current law, the maximum duration of a chapter 13 plan is five years from the due date of the first plan payment. In March 2020, Congress amended § 1329 through the Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act") by adding subsection (d) which allowed chapter 13 debtors who were experiencing financial hardship due to the COVID-19 pandemic to modify confirmed plans by (among other things) extending the life of the plan to seven years. § 1329(d)(2). The subsection was not a permanent addition and it automatically expired one year later. § 1329(d) repealed by Pub.L. 116-136, Div. A, Title I, § 1113(b)(2)(A)(iii), Mar. 27, 2020, 134 Stat. 312.

petition monthly, mortgage/home loan payments shall only be tendered in accordance/by law under the Coronavirus Aid, Relief, and Economic Security Act, (hereinafter, "Cares Act"); and in conjunction with, if any, other applicable state/federal laws, and/or upon Order of the Court, if required.

Modified Plan, Bk. Dkt. No. 187 (errors in original).

Although the forbearance was only 12 months, Sanders treated the initial forbearance as limitless and made no further Maintenance Payments after January 2020.

## C.    Trustee's notice of final cure mortgage payment under Rule 3002.1.

Sanders cured her prepetition arrears by completing all Plan Payments to the trustee in October 2022. On November 2, 2022, the trustee filed a notice of final cure mortgage payment under Rule 3002.1(f) which stated that Sanders had completed her Plan Payments and fully cured the Loan's prepetition arrears of $39,092.21.

### 1.    Creditor's Rule 3002.1(g) response.

The Creditor timely filed a response under Rule 3002.1(g). The Creditor concurred that Sanders had cured her prepetition arrears but notified the trustee that Sanders was delinquent on her post-petition Maintenance Payments in the amount of $97,837.24 for the time period November 1, 2018 – November 1, 2022. Creditor subsequently reduced the amount to $96,438.92 when Creditor realized it had failed to account for a May 1, 2019, notice of change in payment which was withdrawn a year later.

5

**2. Sanders's Rule 3002.1(h) motion for a determination of final cure.**

Sanders disagreed that she was in post-petition default and filed several motions pursuant to Rule 3002.1(h) seeking a determination that she had cured her default and paid all required post-petition amounts. The bankruptcy court allowed discovery and conducted several hearings related to evidence (or lack thereof) of Sanders's post-petition mortgage payments.

Although Sanders filed many documents none of them purported to show evidence of post-petition payments not accounted for by Creditor. Moreover, rather than focusing solely on the amount of her post-petition arrearage, Sanders attempted to litigate a host of unrelated issues. Despite multiple warnings from the bankruptcy court that it would not address unrelated issues, Sanders included argument alleging: (1) deficiencies in the assignments of the Loan; (2) lack of the Creditor's standing; (3) inaccurate calculation of escrow, interest, and application of her payments starting at the origination of the Loan in 1995 (regardless that the Loan has been the subject of two confirmed chapter 13 plans and several court orders); and (4) the Creditor's lack of compliance with various state and federal laws and programs related to COVID-19 assistance.

The arguments that were ultimately addressed by the bankruptcy court in its summary judgment order were Sanders's arguments that she should be determined to be post-petition current because: (1) she was

entitled to additional forbearance; (2) the Creditor failed to offer her required exit strategies; (3) her modified plan prevented the Creditor from requiring repayment of the forborne amount; and (4) the Creditor should have applied $77,000.00 in COVID-19 assistance funds to the Loan.

Sanders argued in her various Rule 3002.1(h) motions that she was entitled to additional forbearance and that the Creditor had failed to properly account for her forbearance in its Loan amortization. It is without reasonable dispute that the Creditor caused confusion as to when Sanders's forbearance started and ended.[5] The Creditor's mistakes seemed to justify (at least in Sanders's mind) that the Creditor's accounting could not be trusted. Sanders also argued that the language in her modified plan contractually bound the Creditor to provide additional forbearance to which Sanders believed she was entitled under the CARES Act.

---

[5] The following summarizes the Creditor's communications which led to confusion. The Creditor sent Sanders a letter dated July 28, 2020 stating that it was granting a 3-month forbearance starting on July 1, 2020 and ending on October 1, 2020. In another letter two weeks later (dated August 7, 2020), the Creditor stated that it had granted Sanders 6-month forbearance starting April 1, 2020 and ending October 1, 2020. The Creditor's first filed notice of forbearance (filed on August 13, 2020) also reflected a six-month forbearance beginning April 1, 2020. But, on November 13, 2020, the Creditor sent Sanders a letter which listed the original forbearance starting date as July 1, 2020 and an ending date of March 1, 2021. On November 20, 2020, the Creditor sent Sanders another letter which again stated that her forbearance would end on March 1, 2021 but that if she remained unable to make her payments by March 1, 2021, that the Creditor would "auto-extend" the forbearance in three-month increments. In addition, on February 10, 2021, Sanders received a letter stating that when the Loan was transferred from SLS to US Bank/Fay Servicing, SLS failed to inform US Bank of Sanders's forbearance. US Bank then contacted SLS and confirmed that Sanders's Loan was on an active forbearance which began on April 1, 2020 and ended in March 2021.

In response, the Creditor did not dispute that Sanders was given a 12-month forbearance. The Creditor argued, however, that Sanders was not entitled to additional forbearance. Creditor further argued that regardless of its conflicting statements regarding its starting and ending dates, Sanders's forbearance ended before October 2022, when she completed her Plan Payments.

Sanders also argued that not only did the Creditor not offer her the "slew" of forbearance exit strategies to which she was entitled under the CARES Act, the Creditor never offered any exit options. Sanders further argued that because she was entitled to certain exit options, the Creditor was prohibited from requiring a lump sum payment of the forborne amount at the end of the forbearance period.

The Creditor disputed Sanders's assertion, arguing that her Loan was not a federally backed mortgage loan and therefore not subject to the CARES Act,[6] and, regardless, it did provide Sanders exit options. The Creditor presented copies of letters it sent to Sanders on August 26, 2020, September 4, 2020, and October 26, 2020, in which it presented Sanders with possible exit strategies and requested Sanders's response.

---

[6] The CARES Act defined "Federally backed mortgage loan" as those loans insured by the Federal Housing Administration, insured under § 255 of the National Housing Act, guaranteed under § 184 and 184A of the Housing and Community Development Act of 1992, guaranteed or insured by the Departments of Veterans Affairs or Agriculture, or purchased or securitized by the Federal Home Loan Mortgage Corporation or Federal National Mortgage Association. 15 U.S.C. § 9056(a)(2).

According to the Creditor, Sanders did not respond to any of the letters or seek any exit options. Because Sanders had not sought a repayment option or other exit strategy, and because the forborne amount was not forgiven and merely delayed, the Creditor explained it was due and payable when the forbearance ended. Because it was undisputed that Sanders did not pay the forborne amount, the Creditor argued that it was without reasonable dispute that Sanders was not post-petition current at the time she completed her Plan Payments, and the trustee issued the notice of final cure mortgage payment under Rule 3002.1(f).

Finally, Sanders argued that the Creditor should not have returned $77,000 in assistance funds. Sanders alleged that she applied to the California Housing Finance Agency under the California Mortgage Relief Program for mortgage relief assistance ("HAF Program") on January 10, 2022. To complete the application Sanders used the information provided on her December 11, 2021 mortgage statement. That statement indicated her total due and owing was $77,630.16.[7] Sanders's January 10, 2022 statement showed a total due and owing of $79,649.82. Because the statements included amounts owing for escrow, interest, taxes and insurance, and other, Sanders believed the amount accurately reflected the amount necessary to payoff the Loan ("Payoff Amount"). Therefore, when

---

[7] This amount included: (1) Principal $1,008.85; (2) Interest $313.69; (3) Escrow (Taxes and Insurance) $697.12; (4) Monthly Post-Petition Payment $2,019.66; (5) Overdue Post-Petition Payments $76,563.08; (6) Total Post-Petition Fees or Charges $0.00; and (7) Suspense (Unapplied Funds (-$952.58)).

Sanders filed her application on January 10, 2022, she indicated that the Payoff Amount was $77,630.16 (which was just under $80,000, the maximum amount allowed under the program). After Sanders submitted the application, the following undisputed events occurred:

- January 10, 2022: HAF Program informed Sanders that her servicer was not participating in the program but that it would keep her application in the event her servicer started participating.

- January 24, 2022: HAF Program informed Sanders that her servicer was now participating and that her application was being processed.

- May 27, 2022: HAF Program informed Sanders that she received initial approval for $77,000.00 ("HAF Funds").

- July 27, 2022: HAF Program informed Sanders that she was no longer eligible because her loan was modified and no longer delinquent.

- September 14, 2022: HAF Program informed Sanders that her servicer confirmed that the HAF Funds had been applied to bring her loan current as of 6/30/2022.

- September 15, 2022: HAF Program congratulated Sanders on her approved mortgage grant through the HAF Program.

- September 16, 2022: HAF Program informed Sanders that the HAF Funds were distributed to her mortgage servicer and that it was awaiting confirmation that those funds were applied to her loan.

- October 21, 2022: HAF Program informed Sanders that it regretted to inform her that her mortgage servicer recalculated the past-due amount owed on her mortgage and notified the HAF Program of the new calculation, which exceeded the Program's $80,000 limit. The HAF Program explained that as a result, Sanders's application no longer met the eligibility requirements and could not be funded. The

10

HAF Program informed Sanders that her mortgage servicer returned the HAF Funds.

- November 30, 2022: HAF Program informed Sanders that "[y]esterday afternoon our Appeals Board convened and your application was presented as a candidate for an exception to the policy. Unfortunately, the amount past due at the time you submitted your application was in excess of $80,000.00 - our program limit. Your servicer did not provide the accurate arrearage information initially or in subsequent arrearage verifications. It was not until the grant funding was disbursed to them that they identified the escrow arrearage - which amount caused your total arrearage to exceed the amount of $80,000.00. Our program relies on the servicer providing this information throughout the process and unfortunately their system did not capture it until applying the grant funding to the loan. We urge you to connect with a HUD counselor or your servicer to determine other options that may exist for you."

Sanders argued she should not suffer due to Creditor's mistake, and she was entitled to the HAF Funds.

In response, the Creditor admitted that it initially provided the HAF Program with a Payoff Amount of $77,000 that was good through February 28, 2022, but it argued that it had no choice but to return the HAF Funds when it recalculated and determined that Sanders no longer qualified.

The Creditor alleged in its declaration supporting its opposition to Sanders's Rule 3002.1(h) motion that the Payoff Amount it provided to the HAF Program was "incorrect due to a mortgage system glitch caused by the arrears being higher than the current unpaid principal balance." The Creditor stated that when it was correctly calculated, the Payoff Amount

11

should have been $93,147.59. Because the Payoff Amount was greater than $80,000, the maximum allowed by the HAF Program, the Creditor argued that it had no choice but to return the HAF Funds.

## D. Bankruptcy court's order granting summary judgment.

Sanders received her discharge on July 13, 2023. On September 1, 2023, after nearly nine months of discovery and multiple opportunities[8] for Sanders to provide evidence of her post-petition payments, the Creditor filed a motion for summary judgment on Sanders's Rule 3002.1(h) motion. After a final hearing, the bankruptcy court entered an order determining that there was "no genuine dispute as to any material fact . . . that Sanders was not post-petition current" at the time she completed her Plan Payments ("Summary Judgment Order").

In the Summary Judgment Order the bankruptcy court explained that the legal issue before the court was narrow, solely whether under Rule 3002.1(h) Sanders was current on her Maintenance Payments when she completed her Plan Payments. The bankruptcy court rejected Sanders's assertion that the Creditor breached her modified plan by providing only a 12-month forbearance, by failing to provide specific exit strategies, and requiring repayment of the forborne amount. The bankruptcy court found that regardless of when the forbearance began, there was no reasonable dispute that it ended before Sanders completed her Plan Payments to the

---

[8] The bankruptcy court conducted approximately 28 hearings each of which was at least tangentially related to Sanders's post-petition mortgage payments.

trustee, and that the forbearance merely delayed and did not forgive payments due during this time. To the extent that Sanders argued that the Creditor was obligated to provide certain benefits and protections under various COVID-19 related programs, the bankruptcy court found those issues were not properly before the court.

The bankruptcy court also rejected Sanders's assertion that the HAF Funds should have been credited toward her post-petition arrearage. The bankruptcy court noted that, while it was sympathetic to Sanders, there was no basis to relieve the Creditor's obligation to return the HAF Funds when it determined Sanders's arrearage was over the program's limit.

The bankruptcy court concluded that based on its factual findings, there was no genuine dispute as to any material fact that Sanders was not post-petition current on her mortgage payments to Creditor under Rule 3002.1(h).

Sanders filed a motion to alter or amend the Summary Judgment Order. Sanders again alleged deficiencies in the Loan assignments and that the Creditor lacked standing. Sanders also alleged that if Creditor had offered her all available exit options at the end of her forbearance, she would not have been in post-petition default, and that the bankruptcy court failed to properly consider her arguments regarding the return of the HAF Funds.

After a hearing, the bankruptcy court entered an order denying Sanders's motion to reconsider, ("Order Denying Reconsideration")

determining that Sanders had not presented any newly discovered evidence and did not contend that there was an intervening change in the controlling law.

Sanders timely appealed both the Summary Judgment Order and the Order Denying Reconsideration.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

Whether the bankruptcy court erred in granting Creditor's motion for summary judgment.

Whether the bankruptcy court abused its discretion in denying Sanders's motion for reconsideration of the Summary Judgment Order.

## STANDARDS OF REVIEW

We review de novo the bankruptcy court's summary judgment ruling. *Ulrich v. Schian Walker, P.L.C. (In re Boates)*, 551 B.R. 428, 433 (9th Cir. BAP 2016). "De novo review requires that we consider a matter anew, as if no decision had been made previously." *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014).

We review for an abuse of discretion a denial of a motion for reconsideration. *First Ave. W. Bldg., LLC v. James (In re OneCast Media, Inc.)*, 439 F.3d 558, 561 (9th Cir. 2006). We conduct the same review for an order denying a motion for reconsideration, whether the motion for

14

reconsideration is based on Civil Rule 59(e) or Civil Rule 60(b). *School Dist. No. 1J v. AC & S, Inc.*, 5 F.3d 1255, 1262 (9th Cir. 1993). A bankruptcy court abuses its discretion if it applies an incorrect legal standard or if its factual findings are illogical, implausible or not supported by the record. *United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc).

## DISCUSSION

### A.    Summary judgment standard.

Civil Rule 56(c) (applicable through Rule 7056) provides that summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute over material facts is "genuine" where a reasonable jury could return a verdict for the nonmoving party based on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001). A fact is "material" if it could affect the outcome of the case under the controlling substantive law. *Anderson*, 477 U.S. at 248; *Far Out Prods., Inc.*, 247 F.3d at 992. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).

**B.     Rule 3002.1**.

Under Rule 3002.1(f), "after the debtor completes all payments under the plan, the trustee shall file and serve on the holder of the claim . . . a notice stating that the debtor has paid in full the amount required to cure any default on the claim." The creditor then has 21 days to respond by filing a statement indicating (1) whether it agrees that the debtor has cured the default on the claim, and (2) whether the debtor is current on all post-petition mortgage payments consistent with § 1322(b)(5). *See* Rule 3002.1(g). If the creditor asserts that post-petition amounts are owed and the debtor disagrees, the debtor may request a determination by the court whether the debtor has cured the default and paid all required post-petition amounts. *See* Rule 3002.1(h); *In re Howard*, 563 B.R. 308, 314 (Bankr. N.D. Cal. 2016).

**C.     Application of Rule 3002.1.**

The bankruptcy court determined that there was no genuine dispute of material fact as to Sanders's failure to be current on her post-petition mortgage payments when she completed her Plan Payments. Despite Sanders's vigorous arguments to the contrary, the bankruptcy court determined that Sanders failed to present admissible evidence sufficient to establish a triable issue of material fact that Creditor's accounting was inaccurate. On appeal, Sanders does not direct the Panel to specific legal errors or erroneous factual findings by the bankruptcy court, rather, she rehashes the same arguments she unsuccessfully presented to the

16

bankruptcy court. Because the bankruptcy court applied the correct law and its factual findings were not erroneous, the bankruptcy court's Summary Judgment Order was not error.

1.    **Sanders could not rely on the language in her modified plan to excuse her nonpayment.**

Sanders argues that that the bankruptcy court erred in granting summary judgment because her modified plan obligated the Creditor to provide a longer forbearance, prohibited the Creditor from seeking a lump sum payment for the forborne amounts, and guaranteed her certain exit strategies. Beyond supposition and conjecture, Sanders does not proffer objective evidence establishing the erroneous nature of the bankruptcy court's findings. Furthermore, Sanders fails to demonstrate that even if she were entitled to the additional benefits and protections, that it would have made a difference as to whether she was post-petition current on her mortgage payments when the trustee filed the notice of final cure mortgage payment under Rule 3002.1(f). Rather, the record demonstrates that Sanders was in post-petition default well before the pandemic and related forbearance programs, and her failure to make regular monthly mortgage payments continued after her forbearance period ended. None of the alleged wrongdoing by the Creditor excuses Sanders's failure to pay for years her ongoing post-petition monthly mortgage payments or nullifies her post-petition default.

As to Sanders's assertions that she was entitled to additional benefits under the CARES Act, the bankruptcy court acknowledged the confusion about the start and end dates of Sanders's forbearance period.[9] Regardless of the conflicting dates, the bankruptcy court found that using the dates most generous to Sanders, the forbearance period expired before she completed her Plan Payments to the trustee on October 27, 2022, and she was not entitled to additional forbearance. The bankruptcy court's findings are supported by the record. Sanders's reliance on the language of her modified plan citing the protections of the CARES Act does not change the result.

The CARES Act obligated the holder of a federally backed loan to provide a 12-month forbearance, not an 18-month forbearance as alleged by Sanders. *See* 15 U.S.C. § 9056(b)(2) (the "forbearance shall be granted for up to 180 days, and shall be extended for an additional period of up to 180 days at the request of the borrower"). While the CARES Act contemplated additional periods of forbearance, it did not require it. Thus, even if Sanders's Loan qualified as a federally backed loan subject to the CARES Act, the CARES Act did not obligate the Creditor to grant Sanders's forbearance from April 2020 (the date Sanders argues was the beginning of her forbearance period) to October 2022 (the date Sanders completed her Plan Payments), a period of approximately 27 months.

---

[9] Sanders argued that that the forbearance was 18 months and expired December 2021, while the Creditor argued it was a 12-month forbearance ending in July 2021.

Furthermore, Sanders's assertion that she would have been post-petition current if the Creditor had properly performed under the CARES Act and other related programs is not plausible and is belied by the record of Sanders's admitted failure to make post-petition Maintenance Payments even before such programs existed. The record demonstrates that Sanders was in post-petition default as early as 2018 which was well before the pandemic and the enactment of the CARES Act. Additionally, the record demonstrates that Sanders did not resume making Maintenance Payments after December 2021, the date Sanders alleges the forbearance ended.[10]

### 2. The HAF Funds would not have cured the post-petition default.

Sanders also argues that the bankruptcy court erred in granting summary judgment because the Creditor should have credited the HAF

---

[10] Although not argued, Sanders's position highlights an untenable inconsistency and a potential default. Sanders argued that the Creditor was bound to certain obligations based on the language in the modified plan, but Sanders likewise did not want to be bound by her obligation to make timely Maintenance Payments directly to the Creditor. In 2019, the BAP found "that a chapter 13 debtor's direct payments to creditors, if provided for in the plan, are 'payments under the plan' for purposes of a discharge under § 1328(a)," and held that "this same rule should apply in the context of post-confirmation plan modifications under § 1329(a)." *Derham-Burk v. Mrdutt (In re Mrdutt)*, 600 B.R. 72, 81 (9th Cir. BAP 2019). The *Mrdutt* Panel explained that "Debtors who fail to make these payments, which often amount to tens of thousands of dollars, benefit from years of living without mortgage payments at the expense of creditors," and that "Chapter 13 debtors who do not pay their post-petition mortgage payments are essentially claiming a deduction to which they are not entitled." *Id.* (citations omitted).

Funds to her post-petition mortgage payments. While the bankruptcy court found that Sanders was "whipsawed by the inconsistent and inaccurate information provided to her throughout the HAF process," it noted that its sympathy was not a legal basis for finding that the Creditor acted inappropriately when it returned the HAF Funds. The bankruptcy court found that the Creditor initially provided the HAF Program with a $77,079.12 reinstatement quote for Sanders's Loan (which fell just below the HAF Program's $80,000 reinstatement limit). The bankruptcy court further found that in reliance upon the Creditor's reinstatement quote, the HAF Program sent the Creditor $77,079.12 to apply to Sanders's Loan. According to the bankruptcy court, "in the process of applying the $77,079.12 to Sanders's account, US Bank discovered that it had miscalculated the reinstatement amount that it transmitted to CalHFA and that the actual reinstatement amount was $85,741." When the HAF Program was notified by the Creditor that the $77,079.12 was insufficient to fully satisfy Sanders's arrears, the HAF Program requested the Creditor return the HAF Funds. The bankruptcy court determined that there was no evidence that "under these facts, US Bank could do anything other than return the funds when requested to do so by CalHFA."

We do not believe that this issue is as clear as determined by the bankruptcy court. A careful review of the record demonstrates that the Creditor's reason for the initial error was inconsistent. Creditor's initial explanation was that the error was the result of a "mortgage system glitch

20

caused by the arrears being higher than the current unpaid principal balance," but in its supplemental opposition to Sanders's Rule 3002.1(h) motion, the Creditor argued that the Payoff Amount that it provided the HAF Program was incorrect because there was a missing prepetition payment that was not reflected in Sanders's mortgage statements. The Creditor made no mention of a system error caused by the arrearages being more than the principal.

Additionally, the Creditor's corrected Payoff Amount was also inconsistent. It ranged from as high as $93,147.59 to as low as $79,649.82. In its opposition to Sanders's Rule 3002.1(h) motion, the Creditor alleged the correct Payoff Amount was $93,147.59. However, in its motion for summary judgment (and supporting declarations) the Creditor alleged the correct Payoff Amount was $85,741.00. Both of these amounts differ from $79,649.82, which was the amount identified in the Creditor's Notice of Final Cure Payment as the total due and owing as of February 1, 2022. Importantly, the Creditor did not present the court with any copies of the documentation related to its communications with the HAF Program and it did not explain the discrepancies within its own filings.

Regardless, this is a red herring because even if the Panel were to determine that the bankruptcy court's factual findings on this issue were erroneous, the ultimate determination as to Sanders's post-petition default would not change. This is because even if the HAF Funds were credited to Sanders's Loan, Sanders would not have been current on her post-petition

21

monthly mortgage payments when the trustee filed the notice of final cure mortgage payment under Rule 3002.1(f).

According to the evidence presented, the application of the $77,079.12 in HAF Funds would have allegedly made Sanders's Loan current as of February 2022. However, Sanders did not finish her Plan Payments until October 2022. During the time between when her Loan would have allegedly been current and the date she finished her Plan Payments, Sanders made no Maintenance Payments. Indeed, she had not made any Maintenance Payments since January 2020. Accordingly, even if Sanders were post-petition current on February 28, 2022, because of the application of the HAF Funds, she would have been in post-petition default by the time the trustee filed his notice of final cure payment on November 2, 2022, based on Sanders's failure to make any Maintenance Payments during the period March 2022-October 2022.

Thus, based on an independent review of the record, the bankruptcy court applied the correct law and its finding that there was no dispute that Sanders was not post-petition current at the time she completed her Plan Payments is supported by the record. Therefore, the bankruptcy court did not err in entering the Summary Judgment Order.

### D. The bankruptcy court did not abuse its discretion in denying Sanders's motion to reconsider the Summary Judgment Order.

Sanders's motion for reconsideration constituted a timely motion to alter or amend the judgment under Civil Rule 59(e), made applicable by

Rule 9023. *Heritage Pac. Fin., LLC v. Montano (In re Montano)*, 501 B.R. 96, 112 (9th Cir. BAP 2013). The Ninth Circuit has instructed that "altering or amending a judgment under Rule 59(e) is an 'extraordinary remedy' usually available only when (1) the court committed manifest errors of law or fact, (2) the court is presented with newly discovered or previously unavailable evidence, (3) the decision was manifestly unjust, or (4) there is an intervening change in the controlling law." *Rishor v. Ferguson*, 822 F.3d 482, 491-92 (9th Cir. 2016) (citing *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011)). A party may not use a Civil Rule 59(e) motion to present a new legal theory for the first time, to raise legal arguments which could have been made in connection with the original motion, or to rehash the same arguments already presented. *Wall St. Plaza, LLC v. JSJF Corp. (In re JSJF Corp.)*, 344 B.R. 94, 103 (9th Cir. BAP 2006), *aff'd and remanded*, 277 F. App'x 718 (9th Cir. 2008).

The bankruptcy court did not abuse its discretion in denying Sanders's motion for reconsideration of the Summary Judgment Order because Sanders failed to demonstrate any basis for relief. Rather, Sanders used her motion to merely rehash the same arguments already presented.

## CONCLUSION

For the reasons stated above, we AFFIRM.